## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **JENNIFER L. VANCE,** | ) | **Case No.  3:13CV1617** |
| | ) | |
| **Plaintiff,** | ) | **MAGISTRATE JUDGE** |
| | ) | **GEORGE J. LIMBERT** |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN[1],** | ) | <u>**MEMORANDUM OPINION & ORDER**</u> |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1.  Plaintiff asserts that the Administrative Law Judge ("ALJ") erred in his decision because he failed to find that her impairments met Listing 1.04(A) and by finding that she could perform modified light work. ECF Dkt. #11.  She additionally and/or alternatively requests that the Court remand her case based upon new evidence that she submitted.  *Id.* at 20.

For the following reasons, the Court AFFIRMS the ALJ's decision and dismisses Plaintiff's complaint in its entirety with prejudice.  The Court also denies Plaintiff's request for remand.

## I.    PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on July 7, 2010 alleging disability beginning July 14, 2009 due to "[c]rushed bones in top of neck, bad disc in back, carpal tunnel, tumor in right arm,

---

[1]  On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

mental problems, stress." Tr. at 152-161, 247[2].

The Social Security Administration ("SSA") denied Plaintiff's applications initially and upon reconsideration. Tr. at 71, 87-93, 95-97.  Plaintiff requested a hearing before an ALJ which was held on February 10, 2012.  *Id*. at 27, 98.

On February 24, 2012, the ALJ issued a decision finding first that Plaintiff engaged in substantial gainful activity from July 2009 through March 2010 as she returned to work after her injury.  Tr. at 13.  The ALJ explained, however, that there was a continuous twelve-month period during which Plaintiff did not engage in substantial gainful activity, so he proceeded onward in the sequential analysis.  *Id*.

The ALJ found at Step Two that Plaintiff had the severe impairments of adjustment disorder/depressed mood, obesity, and degenerative disc disease ("DDD").  Tr. at 13.  The ALJ further found that none of Plaintiff's severe impairments, either individually or in combination, met or equaled a listed impairment in 20 C.F.R. Part 4, Subpart P, Appendix 1.  *Id.* at 13-14.  He found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following modifications: the ability to alternate between sitting and standing, so long as she is not off task more than ten percent of the workday; occasional climbing of ladders, ropes or scaffolds;  occasional stooping, kneeling, crouching and crawling; and limitations to work that is low stress, which he defined as having occasional decision-making, "occasional setting[sic] in the work setting," and no strict production quotas.  *Id*. at 15.  Based upon this RFC, the ALJ found that Plaintiff could not return to her past relevant work, but, relying upon the testimony of the vocational expert ("VE"), she could perform other jobs existing in significant numbers in the national economy, such as the representative

---

[2]  Page references are to Page ID Numbers in the transcript of proceedings.

occupations of a repack room worker, office helper, or storage facility rental clerk.  *Id*. at 19-20.

Plaintiff appealed the ALJ's decision to the Appeals Council, but the Appeals Council denied her request for review.  Tr. at 1-7.  The ALJ's decision therefore became the final decision of the Commissioner.

Plaintiff appealed that decision to this Court on July 25, 2013.  ECF Dkt. #1.  Plaintiff, through counsel, filed her brief on the merits on October 17, 2013.  ECF Dkt. #11.  Defendant filed her brief on the merits on November 15, 2013, and Plaintiff filed a reply brief on November 27, 2013.  ECF Dkt. #s 12-13.  The parties consented to the jurisdiction of the undersigned on August 6, 2014.  ECF Dkt. #14.

## II.    SUMMARY OF MEDICAL EVIDENCE

On August 29, 2001, Plaintiff underwent a right carpal tunnel release surgery and on September 12, 2011, she underwent a left carpal tunnel release surgery.  Tr. at 314-316.

On November 9, 2007, chiropractor Autumn Keller evaluated Plaintiff and diagnosed her with cervical strain/sprain.  Tr. at 317-318.  A cervical MRI performed on November 9, 2007 showed mild DDD with small posterior disc osteophyte complexes at C4-C5, C5-C6, and C6-C7, with no evidence of malalignment, stenosis, facet subluxation or cord compression.  *Id.* at 319.

On May 22, 2009, Plaintiff presented to Dr. Hasan for medication review, an itchy ear canal and neck pain.  Tr. at 389.  Dr. Hasan found a normal gait, normal extremity movements, no joint instability and normal muscle strength and tone.  *Id.* at 390.  He noted tender muscles in the neck.  *Id.* He assessed otitis externa, myalga and myositis, insomnia and generalized anxiety disorder.  *Id.*

On July 14, 2009, Plaintiff went to the emergency room after reporting that she slipped and fell at work.  Tr. at 320.  She reported that she fell on her left side and she had left shoulder pain, elbow pain and back pain.  *Id.*  X-rays of Plaintiff's neck, left shoulder and left forearm showed no

evidence of an acute fracture or dislocation, but mild DDD with osteophyte formation in the cervical spine and mild degenerative changes of the acromioclavicular joint in the left shoulder. *Id.* at 327. An x-ray of her back showed degenerative changes of the facets at L3-L4 through L5-S1, grade I anterolisthesis of L4 relative to L5 secondary to degenerative changes of the facets, and disc space narrowing at L2-L3. *Id.* at 327-328. Plaintiff was diagnosed with shoulder strain, forearm strain, lumbar sprain and neck sprain. *Id*. at 323. She was given Darvocet and discharged home. *Id.*

On October 15, 2009, Plaintiff underwent a MRI of her neck which showed: a broad-based disc bulge with minimal paracentral protrusion at C3-C4 which indented the thecal sac and touched the spinal cord without cord signal abnormality; broad-based disc bulge with facet degenerative changes which touched the thecal sac and indented the spinal cord without cord signal abnormality; a broad-based disc bulge at C5-C6 with facet degenerative changes; a disc protrusion at C6-C7 with mild bilateral neural foraminal narrowing with possible impingement of the nerve roots; and a disc bulge at C7-T1. Tr. at 330. The overall impression was mulitlevel degenerative changes with possible nerve root impingement at C6-C7 on the left. *Id.*

On December 7, 2009, Plaintiff participated in physical therapy and the therapist reported that Plaintiff was working 12-hour shifts and the only thing she could not do at her job was wear an apron because of the pressure it put on the back of her neck. Tr. at 334. Plaintiff complained of right shoulder to elbow numbness, pinching and tightness to her cervical spine, and low back soreness. *Id.*

On January 12, 2010, Dr. Clark, a neurosurgeon, evaluated Plaintiff for her complaints of back and neck pain following her slip and fall while on the job. Tr. at 368. Dr. Clark read Plaintiff's cervical MRI and concluded that it showed a ruptured C6-C7 disc with an extruded free fragment on the right, causing root and cord compression, and a focal disc rupture on the left. *Id*. He indicated that the individual reading the MRI indicated a left disc protrusion but missed the extruded free fragment,

-4-

which he opined was the main source of Plaintiff's symptoms on the right side.  *Id.*  Dr. Clark opined that Plaintiff's motor, sensory and reflex examinations showed evidence of a clinical myeloradiculopathy referable to the C6-C7 level and he described those findings as triceps weakness, hypersthesias in the index and middle fingers of the right hand, and proximal leg weakness with slight hyperreflexia.  *Id.* at 369.  He also indicated that when Plaintiff extended her head, the findings were increased in severity.  *Id.*  Dr. Clark recommended that Plaintiff undergo an anterior cervical microdiskectomy and fusion at C6-C7 because conservative therapy since July had failed to resolve her symptoms.  *Id.*

On March 6, 2010, Dr. Steinman of the Steinman Neurology Group performed an independent medical evaluation of Plaintiff for the Bureau of Worker's Compensation.  Tr. at 337.  He noted that Plaintiff told him that after she slipped and fell on the job, she had a MRI of her neck and Dr. Clark recommended that she undergo surgery.  *Id.*  As to her past medical history, Plaintiff reported her prior carpal tunnel release surgeries, the removal of a tumor in her left forearm, and a prior work-related injury affecting her neck and back when a garbage can on wheels flipped and struck her in the chin.  *Id.* at 338.  Dr. Steinman noted that despite her current injuries, Plaintiff had not missed any time from work and continued to work without restrictions, which included cooking, cutting and preparing food for patients at the hospital and using skillets, pots and pans.  *Id.*

Plaintiff informed Dr. Steinman that she had constant discomfort and pain in her neck that radiated into her shoulders, more to the right than the left and to her elbow.  Tr. at 338.  She also complained of low back pain that radiated into both lower extremities, more on the right than left side, and numbness and tingling from her right shoulder to right elbow and from right hip to the toes on her right foot.  *Id.*

Dr. Steinman reviewed Plaintiff's medical history and radiology reports, including the notes of Dr. Clark and the October 15, 2009 MRI.  Tr. at 339.  Upon such review, Dr. Steinman found no evidence of a disc extrusion and he found no nerve root compromise.  *Id*. at 338-339.  He opined that Plaintiff did not have a myelopathy, radiculopathy or disc extrusion.  *Id*. at 341.  He concluded that Plaintiff had multilevel cervical degenerative joint and disc disease secondary to the natural and normal aging process.  *Id.* Based upon his physical examination and medical record review, he opined that insufficient credible evidence existed to support a worker's compensation request for a surgical intervention, post-operative physical therapy, bone growth stimulation and cervical films with flexion and extension views.  *Id*.

On April 14, 2010, Plaintiff presented to Dr. Hasan for her complaints of inability to sleep at night and numbness in her arm that radiated to her right leg.  Tr. at 387.  He conducted an examination and found that Plaintiff had a normal gait, normal extremity movements, no joint instability and normal muscle strength and tone.  *Id*. at 388.  However, he noted positive straight leg raising on the right lower extremity and a tender low back.  *Id*.  He assessed lower back pain, lumbar radiculopathy, generalized anxiety disorder and myalgia and myositis.  *Id*.

Physical therapy notes dated July 17, 2009 through December 14, 2010 show that Plaintiff continuously complained of neck pain with right forearm and finger and thumb numbness, headaches, shoulder pain, and low back pain with right leg and left leg numbness.  Tr. at 343-357, 392-417.  It was noted that Plaintiff continued with physical therapy mainly for pain management.  *Id*. at 344. Straight leg raising was positive on the right "at full lock out" on June 23, 2010.  *Id*.

-6-

On September 7, 2010, Dr. Tanley, Ph.D, a neuropsychologist, performed a clinical interview and evaluation at the request of the agency.  Tr. at 358.  In describing her health, Plaintiff explained that she fell at work and a 400-pound garbage can hit her in the face.  *Id*.  She reported that she had "two shattered bones with fragments" in her neck and she had lumbar problems, but the MRI was not low enough to show what was wrong with her back.  *Id*.  She also indicated that she felt sad, she did not sleep, and she had no motivation.  *Id*.  Dr. Tanley found that Plaintiff's affect was appropriate and while Plaintiff cried during the interview, she did not report suicidal or homicidal ideations and she did not allege guilt, hopelessness, helplessness or worthlessness.  *Id*. at 359.  He found no evidence of anxiety, and no evidence of delusions or paranoid ideations.  *Id*.  Dr. Tanley found that Plaintiff's memory was intact, she was alert and oriented, and she was operating at least at the low average level of intellectual functioning.  *Id*.

Based upon his examination, Dr. Tanley diagnosed Plaintiff with adjustment order with chronic depressed mood and he opined that Plaintiff's impairment did not impair her ability to understand and follow simple instructions or her ability to maintain attention to perform simple, repetitive tasks.  Tr. at 360.  He opined that her mental impairments caused mild limits in her ability to relate to others, and moderately impaired her ability to withstand the stress and pressures of daily work.  Tr. at 360.  He rated her global assessment of functioning at 60.  *Id*.

On October 9, 2010, Dr. Clark wrote a letter indicating that he was going to proceed with cervical surgery on Plaintiff which Worker's Compensation had approved.  Tr. at 363.  On October 25, 2010, Plaintiff underwent the anterior cervical microdiscectomy and anterior cervical arthrodesis for diagnoses of ruptured C6-C7 disc with bilateral pain, right greater than left.  *Id*. at 376-377.  She

thereafter participated in physical therapy.  *Id.* at 455-470.

On November 9, 2010, Plaintiff presented to Dr. Hasan for medication renewal and a request for Ambien for insomnia.  Tr. at 385.  Upon examination, he found that Plaintiff had a normal gait, no joint swelling, normal movement in all extremities, no joint instability and normal muscle strength and tone. *Id.* at 386.  He diagnosed myalgia and myositis and lower back pain.  *Id.*

On December 7, 2010, Plaintiff presented to Dr. Hasan for completion of her social security paperwork and medication renewals.  Tr. at 383.  He conducted an examination and found that she had a normal gait, muscle strength and tone and no joint instability.  *Id.*  He found that she had full range of motion in her upper extremities and decreased range of motion in the bilateral lower extremities due to hip pain.  *Id.*  Sensory examination was normal and no motor deficits were found in Plaintiff's lower or upper extremities.  *Id.* at 384.  Dr. Hasan diagnosed cervical disc degeneration, lumbar radiculopathy, and myalgia and myositis.  *Id.*

On December 23, 2010, Plaintiff underwent cervical spine x-rays which showed post-surgical changes but satisfactory alignment and no evidence of instability on the limited flexion and extension of the cervical spine.  Tr. at 417.

On December 28, 2010, Dr. Clark wrote a letter to Dr. Hasan indicating that Plaintiff had  only complaints of dysesthesias relating to her neck surgery, which was normal, but she also complained of persistent pain in and about her right hip which interfered with prolonged walking and standing. Tr. at 428.  Dr Clark reported that upon examining Plaintiff, she had tenderness and clinical findings that suggested hip disease, although he advised her that he did not see a significant focus of nerve root or spinal cord compression in the lumbar region, but she did have DDD.  *Id.*  He told Plaintiff to ask Dr. Hasan for a referral to an orthopedic surgeon for evaluation of her right hip pain.  *Id.*

-8-

On January 25, 2011, Dr. Clark wrote a letter to Dr. Hasan reiterating his prior notation from December 28, 2010 that Plaintiff had hip joint disease.  Tr. at 418.  Dr. Clark indicated that a reasonable basis existed to believe that Plaintiff's hip injury was caused by her slip and fall at work. *Id.*  He also stated that Plaintiff's cervical incision was healing well and she reported improvement in her neck and arm function.  *Id.*  He recommended that Plaintiff call her attorney to appeal the denial by Worker's Compensation of her hip injury claim.  *Id*. at 419.  He recommended that Plaintiff be evaluated by an orthopedic surgeon under her Worker's Compensation claim.  *Id.*

On January 31, 2011, Plaintiff presented to Dr. Hasan to complete her social security paperwork.  Tr. at 431.  Plaintiff informed Dr. Hasan that she was unable to work due to stiffness and pain and numbness in her neck, lower back, hips, legs, and shoulders.  *Id.*  She also reported that she could not sleep, had anxiety and depression, and did not like to be around people.  *Id.*  Upon examination, Dr. Hasan noted that Plaintiff had a normal gait, no joint swelling, no joint instability and normal muscle strength and tone.  *Id.*  She had decreased range of motion in her bilateral lower extremities due to pain in her hips.  *Id.*  He diagnosed cervical disc degeneration, lower back pain and lumbar radiculopathy.  *Id*. at 432.

On February 2 and 9, 2011, Dr. Ward, a clinical psychologist, interviewed, tested and evaluated Plaintiff in order to determine whether she had a psychological disorder and whether it resulted from her work injury.  Tr. at 443.  Dr. Ward found that Plaintiff had a flat affect and a markedly depressed and anxious mood.  *Id*. at 445.  Dr. Ward related that Plaintiff had good verbal skills and appeared to have average intelligence, but she seemed distant interpersonally.  *Id.*  Testing revealed that Plaintiff was experiencing a very high degree of stress and had a significant degree of suspiciousness and anger.  *Id.*  It also showed that Plaintiff was overly sensitive to criticism,

-9-

experienced low morale and had a very depressed mood.  *Id*.  Based upon testing and her interview of Plaintiff, Dr. Ward opined that Plaintiff had Generalized Anxiety Disorder Not Otherwise Specified and Major Depression, Single Episode, Severe with Psychosis.  *Id*. at 446.  Dr. Ward further opined that Plaintiff's psychological conditions were a direct and proximate result of her July 14, 2009 work injury.  *Id.*  She concluded that Plaintiff was temporarily and totally disabled due to her marked difficulties with concentration and frustration tolerance, and her mood impairment, excessive anxiety, interpersonal impairments, low energy, and her markedly poor sleep and subsequent fatigue.  *Id*.

On March 15, 2011, Dr. Clark wrote a letter to Dr. Hasan informing him that Plaintiff returned to his office complaining of severe low back pain with lower extremity radiation.  Tr. at 425.  He noted that Plaintiff had no complaints relative to her cervical spine surgery, but she complained of the back pain and limited ability to walk.  *Id*.  Upon examination, he noted bilateral proximal leg weakness greater on the right side.  *Id.*  He opined that the findings and Plaintiff's history suggested a possible small spinal canal for which he was ordering a lumbar MRI.  *Id*.

On April 5, 2011, Plaintiff had a lumbar spine MRI which was compared to her prior October 14, 2010 MRI and showed no significant difference from the prior exam.  Tr. at 433.  The April 5, 2011 MRI showed significant disc dessication and subtle loss of disc at L2-L3 which was unchanged from the prior exam.  *Id*.  The MRI also showed a right side eccentric disc bulge at L3-L4 that effaced the right lateral recess and neural foramen, which was also unchanged from the prior exam.  *Id.*  At L4-L5, the MRI showed a very mild degree of diffuse posterior disc bulge at the midline with minimal narrowing of the right side neural foramen and at L5-S1, the disc was well-preserved with no spinal canal stenosis.  *Id.*

On April 12, 2011, Dr. Clark wrote another letter to Dr. Hasan indicating that he evaluated her on March 15, 2011 for bilateral proximal leg weakness, greater on the right. Tr. at 422. He indicated that Plaintiff had weakness with lifting her thigh when in the seated position, climbing stairs and arising from a seated position. *Id.* He noted that Plaintiff paid for a MRI by installment plan after Worker's Compensation denied her request and he found that the MRI showed neural foraminal narrowing with root entrapment at L3-L4 and L4-L5 bilaterally, greater on the right. *Id.* While suggesting the possibility and complexity of a surgery, Dr. Clark indicated that he was not urging immediate surgical intervention. *Id.* He cited the Worker's Compensation denial and the slow progression of the condition which in half of cases is relieved by epidural steroid treatments injected into the neural foraminas. *Id.* He referred Plaintiff to a pain clinic for said injections. *Id.* If injections failed, Dr. Clark recommended anterior lumbar surgery at L3-L4 and L4-L5. *Id.*

On June 7, 2011, Dr. Clark wrote Dr. Hasan a letter explaining that Plaintiff had told him that her worker's compensation claim had not been resolved and they were unable to proceed with surgery until it was resolved. Tr. at 478. He also indicated that Plaintiff's pain had progressed in severity and had a burning, tingling, dysesthetic character which extended to her feet. *Id.* He noted that standing for Plaintiff for more than ten minutes was intolerable, as well as walking for more than five to ten minutes. *Id.* She also reported that she was uncomfortable in bed and was frequently awakened when she turned in bed because it triggered radiating pain into both of her legs. *Id.* Dr. Clark also noted that Plaintiff had developed a psychological reaction to her illness, as well as almost constant acid indigestion, which he believed was stress-related and related to her ongoing pain. *Id.*

On June 26, 2011, Dr. Ward wrote a letter to Plaintiff's attorney responding to counsel's request that she review a June 11, 2011 psychological report by a Dr. Kuna concerning Plaintiff's

psychological conditions and their relationship to her work injury in 2009.  Tr. at 438.  Dr. Ward explained that she first evaluated Plaintiff on February 9, 2011 and opined that Plaintiff met the criteria for the diagnosis of Generalized Anxiety Disorder and Major Depression and was temporarily and totally disabled.  *Id*.  She recommended that Plaintiff undergo psychotherapy and Plaintiff participated on March 29, 2011, April 6, 2011, April 19, 2011, and June 15, 2011 and had excuses for other missed appointments.  *Id.*  Dr. Ward indicated that Plaintiff presented at sessions markedly depressed, tearful, agitated and anxious and was preoccupied with her work injury and problems relating to that injury, including relationship problems and financial problems as her employer was making it difficult for her to get the medical care that she needed.  *Id*.

Dr. Ward expressed concern over statements made by Dr. Kuna in his report.  Tr. at 438.  She questioned his opinion that Plaintiff did not have a depressive disorder or an anxiety disorder or that she needed therapy.  *Id*.  She also questioned his finding that Plaintiff had dyslexia and took three and a half hours to complete his test.  *Id*.  She explained that Plaintiff did not take such time to complete her test and had no trouble reading and responding to the items on that test.  *Id*.  at 438-439.  Dr. Ward did agree with Dr. Kuna that Dr. Ward erred in diagnosing Plaintiff with Generalized Anxiety Disorder Not Otherwise Specified as no such diagnosis existed, but only because she should not have added  "Not Otherwise Specified" to the end of her diagnosis.  *Id.* at 439.  She outlined the criteria for Generalized Anxiety Disorder and Major Depression and set forth the findings that led her to conclude that Plaintiff met those diagnoses and they stemmed from Plaintiff's 2009 work injury.  *Id*.

On June 30, 2011, Plaintiff presented for individual psychotherapy with Dr. Ward.  Tr. at 437.  The  treatment  goals  were  to  stabilize  Plaintiff's  mood  and  anxiety  and  to  enhance  her  pain management, daily activities, interpersonal skills and coping skills.  *Id.*  They discussed the stress that

-12-

Plaintiff felt due to her worker's compensation claim and her unresolved pain, including unbearable headaches and panic attacks.  *Id*.  Plaintiff also treated with Dr. Ward on July 19, 2011and Dr. Ward noted that Plaintiff was markedly anxious, depressed and tearful and she was fearful of the future and the ways that her life had changed since her work injury.  *Id*.

On August 23, 2011, Dr. Hasan completed a medical source statement of Plaintiff's abilities to perform physical work activities and the form requested that he checkmark the degree to which Plaintiff could perform particular activities, whether "regular and continuous basis," occasionally," frequently," or "continuously" with the form defining each term.  Tr. at 448.  Dr. Hasan opined that Plaintiff could occasionally lift and carry up to ten pounds and could never lift any higher weight.  *Id*. He opined that Plaintiff could sit, stand and walk up to one hour at one time without interruption and could only do each of these activities up to one hour per eight-hour workday.  *Id*. at 449.  He concluded that Plaintiff could ambulate up to 100 yards without the use of a cane, but a cane was not medically necessary.  *Id*.  As to manipulation activities, Dr. Hasan opined that Plaintiff could occasionally reach with both hands, handle objects occasionally with the right hand and frequently with her left hand, perform fingering frequently with both hands, frequently feel with the right hand and occasionally feel with the left hand, push/pull occasionally with both hands, and frequently operate foot controls with both feet.  *Id*. at 450.  As to the findings that supported these limitations, Dr. Hasan wrote that Plaintiff's subjective symptoms of pain and weakness dictated these findings and he indicated that there were no physical findings.  *Id*.  Dr. Hasan further opined that Plaintiff could never climb stairs, ramps, ladders or scaffolds, or never crawl, but she could occasionally balance, stoop, kneel and crouch.  *Id*. at 451.  As to identifying the clinical findings supporting his assessment, Dr. Hasan wrote "subjective."  *Id*.  Dr. Hasan also indicated that Plaintiff could occasionally move mechanical parts and be around unprotected heights, she could frequently operate a motor vehicle and be exposed to vibrations, and she could continuously be exposed to humidity and wetness, dust, odors

and fumes, temperature extremes and very loud noises. *Id*. at 452. As support for these limitations, Dr. Hasan wrote "Subjective. No physical finding." *Id*. As to activities, Dr. Hasan affirmed that Plaintiff could shop, travel, ambulate without assistive devices, walk a reasonable pace on uneven surfaces, use standard public transportation, climb with the use of a single hand rail, prepare a simple meal and feed herself, care for her personal hygiene, and sort, handle and use paper/files. *Id*. at 453.

The form requested that Dr. Hasan place a date, if he could do so within a reasonable degree of medical certainty, that he believed that Plaintiff's limitations were first present. Tr. at 453. The date that Dr. Hasan handwrote is illegible. *Id*. However, the form also requested that Dr. Hasan opine whether the limitations that he opined lasted or would be expected to last more than twelve months and Dr. Hasan checked the "No" box. *Id.*

On September 19, 2011, Plaintiff underwent a lumbar spine MRI which was compared to the MRI scan of October 14, 2010. Tr. at 474. The most recent MRI showed disc dessication at L2-L3 with very minimal reduction in disc height and extremely mild bulging without evidence of canal or foraminal stenosis, some fluid in the apophyseal joints at the L2-L3 level suggesting the presence of some ligamentous laxity, and some mild osteoarthritic changes at the apophyscal joints at L4-L5. *Id.*

On September 20, 2011, Dr. Clark wrote Dr. Hasan a letter indicating that he examined Plaintiff on that date and Plaintiff reported that Worker's Compensation had denied her request for surgery and she was going to meet with her attorney regarding that denial and whether she could get an amended diagnosis of gastrointestinal upset added to her claim which she felt was related to the stress and anxiety of her illness. Tr. at 476. Plaintiff told Dr. Clark that she continued her normal lifestyle and despite her pain, she was staying active by gardening and mowing her grass. *Id*. at 476. He cited the September 19, 2011 MRI and noted the neural foraminal narrowing and root entrapment shown on the films. *Id.*

On January 25, 2012, Dr. Ward completed a medical source statement of Plaintiff's ability to perform work-related mental activities.  Tr. at 471-473.  The form requested that she check "none," "mild," "moderate," "marked," or "extreme," next to the degree of limitation she thought that Plaintiff had in performing certain activities.  *Id.* at 471.  Each one of those terms was defined.  *Id.*  Dr. Ward opined that Plaintiff had mild limitations in understanding, remembering and executing simple instructions, moderate limitations in making judgments on simple work-related decisions, marked limitations in understanding, remembering and executing complex instructions, interacting appropriately with the public, supervisors, and co-workers, and in responding appropriately to usual work situations and to changes in the work setting.  *Id.* at 471-472.  She also opined that Plaintiff had extreme limitations in her ability to make judgments on complex work-related decisions.  *Id.* at 471.  Dr. Ward identified the factors of decreased mood, concentration and ability to focus, and increased anxiety as factors that supported her assessment.  *Id.*  She also concluded that Plaintiff had very low tolerance for frustration, poor insight and limited judgment.  *Id.* at 472.  She opined with a reasonable degree of medical certainty that the limitations that she found were first presented on February 9, 2011.  *Id.* at 472.

## III.    SUMMARY OF TESTIMONY

On February 10, 2012, the ALJ held a hearing at which Plaintiff, represented by counsel, and a VE testified.  Tr. at 28.  Plaintiff indicated that she was 46 years old and married.  *Id.* at 31-33.  She explained that while she had a driver's license, she had trouble driving because her legs and feet go numb due to her back injury.  *Id.* at 33.  She related that on July 14, 2009, she had an injury while on the job when she slipped and fell, she took one day off to rest after the injury and then returned to work and continued to work for eight months after the injury.  *Id.* at 34.  She explained that she collected worker's compensation benefits but the benefits stopped two months prior to the current hearing.  *Id.* at 35.  She testified that she did not work anywhere else after this injury.  *Id.*

Plaintiff described her impairments, testifying that she had "an incredible amount" of pain all day long in her back and her leg goes numb and she has to sit down a lot as a result. Tr. at 35. She reported that the pain began at the small of her back to her hips and traveled all the way down to her legs and toes and her toes were numb most of the day. *Id*. at 35, 38. She also indicated that the pain levels varied throughout the day and from day to day and she tried to move around and exercise in order to manage the pain. *Id*. at 36-37. She indicated that she took Percocet to relieve the pain and it helped some, taking her pain level from a 9 out of 10 when at its worst to a 4 or 5 out of 10 at most. *Id*. at 37. Plaintiff indicated that she saw Dr. Clark once every six weeks, Dr. Hasan once every three months, and she was seeing Dr. Ward but had to stop two months ago because she no longer had insurance. *Id*. at 38-39.

Plaintiff opined that she could walk two city blocks before she would have to sit down and rest, she could sit for up to one hour, and she could stand for half an hour to 45 minutes but would have to then move around by sitting down, walking, or lying down. Tr. at 39. She indicated that she slept about two to four hours per night and she tried to clean her house, take a shower, and move around during the day, but she spent most afternoons sitting or resting because her back pain would flare up by then and she would take medication and lay down. *Id*. at 40-41. She also described her depression and indicated that she was diagnosed with bipolar disorder and was on medication. *Id*. at 42.

Upon questioning by her counsel, Plaintiff testified that she would not get dressed and remain in the same clothes that she slept in the night before five days out of seven. Tr. at 43. She reported feelings of worthlessness because she could not work and be productive. *Id*. at 44. She explained that she was treating with Dr. Ward, but worker's compensation denied further treatment because Dr. Ward said that Plaintiff's condition was as good as it was going to get. *Id.* She also reported that she underwent a cervical fusion with Dr. Clark and she was satisfied with the results as her neck was as good as it was going to get. *Id.* at 43-46. She also indicated that she had many surgeries on her hands

and she still drops objects constantly. *Id*. at 47. She also explained that Dr. Clark recommended that she have a fusion on her low back as soon as possible but worker's compensation would not allow her claim for low back injury related to the prior slip and fall because the neck condition was masking the low back condition and worker's compensation felt that the injury from the slip and fall was Plaintiff's neck. *Id*. at 48-49. Plaintiff also reported sciatic pain with leg numbness that made her sit and lay down a lot, sometimes the entire day. *Id.* at 50.

Plaintiff testified that Dr. Clark told her that she should refrain from doing anything that is excessive or too intense for her back, such as standing for long periods of time. Tr. at 51. He told her to take breaks of 15-20 minutes per hour. *Id.*

The VE then testified. Tr. at 54-56. The ALJ presented a hypothetical person with Plaintiff's age, education and work background who could perform light work with a sit/stand option at will, so long as the person was not off task more than 10% of the work period, with limitations of occasional climbing of ladders, ropes or scaffolds, frequent climbing of ramps and stairs, frequent balancing, occasional stooping, kneeling, crouching and crawling, and limitations to low stress jobs, defined as having occasional decision-making, occasional changes in the work setting and no strict production quotas. *Id.* at 55. The VE testified that such a person could not perform Plaintiff's past relevant work, but she could perform a significant number of jobs existing in the national economy, including the occupations of repack room worker, office helper, or storage facility rental clerk. *Id.* at 55-56.

The ALJ modified the hypothetical individual to include an individual who could engage in sedentary work with the sit/stand option and 10% off task maximum, no climbing of ladders, ropes, scaffolds, ramps or stairs, no crawling, occasional balancing, stooping, kneeling and crouching, the ability to sit down one hour out of an eight-hour workday, standing a maximum of one hour of an eight-hour workday, and the ability to lay down five out of eight hours of an eight-hour workday. Tr. at 56. The VE testified that no jobs existed for such a person. *Id.*

The ALJ then questioned the sit-stand option and the maximum break time tolerated by employers, with the VE responding that the Dictionary of Occupational Titles did not address the sit-stand option but she was providing information based upon her observations that employers tolerated another 30 to 45 minutes of breaks in addition to two fifteen minute breaks and a lunch break. Tr. at 56-57. The VE also indicated that exceeding the amount of breaks normally tolerated by employers would result in the inability to engage in full-time competitive employment. *Id.*

## IV.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB and SSI. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R. 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R. 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R. 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past

work experience and RFC. *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.     STANDARD OF REVIEW

This Court's review of the ALJ's decision is limited in scope by § 205 of the Social Security Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters*, 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VI.     ANALYSIS

### A.     LISTING 1.04(A)

Plaintiff first asserts that the ALJ erred at Step Three of the sequential evaluation when he failed to discuss any findings or reasoning as to why Plaintiff's impairments did not meet Listing 1.04(A). Plaintiff asserts that her impairments meet Listing 1.04(A).

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity. 20 C.F.R. § 416.920. In the third step of the analysis to determine a claimant's entitlement to social security benefits, it is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. *Evans v.*

*Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987). In order to meet a listed impairment, the claimant must show that her impairments meet all of the requirements for a listed impairment. *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987). An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

> Listing 1.04(A) provides:
>
>> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>>
>>> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

Listing 1.04(A).

In his decision, the ALJ began his Step Three analysis by specifically indicating that he had evaluated Plaintiff's musculoskeletal impairments "in the context of Listing 1.04." Tr. at 14. He went on to conclude that "claimant does not manifest clinical signs and findings that meet the specific criteria of any of the Listings." *Id*. He further stated that "[i]n reaching this conclusion, the opinions of the State Agency medical consultants have been considered. These medical professionals have evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion. (20 C.F.R. 404.1527 and Social Security Ruling 96-5p.)." *Id*. This is the extent of the ALJ's analysis supporting his finding that Plaintiff's impairments did not meet Listing 1.04(A).

Standing alone, it is questionable as to whether this analysis suffices to support a finding that Plaintiff's impairments did not meet Listing 1.04(A). However, the Court may look at the rest of the

ALJ's decision in order to determine whether substantial evidence supports the ALJ's Step Three determination. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 2014 WL 4400999, at *8 (it was proper for the court to look at other steps of ALJ's decision to determine Step Three analysis), citing *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) and *Snoke v. Astrue,* No. 2:10CV1178, 2012 WL 568986 (S.D. Ohio, Feb. 22, 2012), unpublished ("[r]ather, a court must read the ALJ's step-three analysis in the context of the entire administrative decision and may use other portions of a decision to justify the ALJ's step-three analysis.").

Upon review of the entirety of the ALJ's decision, the Court finds that substantial evidence supports his determination that Plaintiff's impairments did not meet Listing 1.04(A). In his Step Four analysis, the ALJ discussed the conflicting medical evidence surrounding Plaintiff's October 15, 2009 cervical MRI. Tr. at 16-17. He cited to Dr. Clark's interpretation of the MRI concluding that Plaintiff had a ruptured disc at C6-C7 with an extruded free fragment which was causing root and cord compression. *Id*. at 17. He then noted Dr. Steinman's opinion that the same MRI did not show a ruptured disc at C6-C7 or nerve root or cord compression but showed only degenerative joint and disc disease secondary to the natural and normal aging process. *Id.* Dr. Clark also found that Plaintiff had triceps weakness and motor, sensory and reflex examinations showed evidence of a clinical myeloradiculopathy. *Id.* at 369. But Dr. Steinman found no clinical evidence of foraminal encroachment, no specific right triceps weakness and no evidence of a disc rupture, hyperreflexia, myelopathy, or radiculopathy. *Id*. at 340-341.

While noting the conflicting reports, the ALJ did not determine whether Plaintiff had a nerve root compression of the cervical spine or whether Plaintiff had motor loss. However, even presuming that Plaintiff's cervical impairment met the nerve root compression and motor loss components of the first part of Listing 1.04(A), the ALJ's Step Four discussion establishes that she did not meet that part of the Listing requiring that the motor loss be accompanied by sensory or reflex loss. In assessing

-21-

Plaintiff's credibility, the ALJ found that the record did not clearly demonstrate that Plaintiff had the sensation loss, reflex abnormalities or other factors associated with intense and disabling pain.  Tr. at 18.  The record supports the ALJ's findings.  Dr. Steinman did note that sensory testing revealed an altered light touch perception in the right upper extremity.  Tr. at 340.  However, he noted normal strength testing and no reflex asymmetry.  *Id.*   Further, Dr. Clark did not cite sensory or reflex findings in his physical examination, except to state that motor, sensory and reflex examinations showed to him evidence of a clinical  myeloradiculopathy, which Dr. Steinman disputed.

The most descriptive clinical examination evidence comes from Plaintiff's primary care physician, Dr. Hasan, who noted on physical examinations on May 22, 2009, April 14, 2010, November 9, 2010, December 7, 2010, January 31, 2011, March 29, 2011 that Plaintiff had normal motor strength, no joint swelling or instability, and normal sensory examinations with no motor deficits in her upper and lower extremities.  *See* Tr. at 383-390, 428-432.  In addition, in his medical source statement, Dr. Hasan indicated that he had no physical findings when he was asked to identify the medical or clinical findings supporting his very severe restrictions for Plaintiff's physical work-related abilities.  *Id.* at 452.  He indicated that it was Plaintiff's subjective symptoms of pain and weakness that supported the restrictions that he determined for Plaintiff.  *Id.* at 450.  Further, the ALJ gave little weight to Dr. Steinman's opinion that Plaintiff had no severe impairment at all.  Tr. at 17.  He did note, however, that despite the MRI results, Plaintiff continued to work full-time, even completing 12-hour shifts.  *Id.* at 16.

As to Plaintiff's lumbar spine impairment, the ALJ cited the medical evidence showing that x-rays confirmed that Plaintiff had DDD of the lumbar spine, but he noted that Dr. Clark's clinical findings conflicted, as in an April 12, 2011 letter to Dr. Hasan, Dr. Clark advised that the clinical examination suggested a possible bilateral intraforaminal root compression.  Tr. at 27, citing Tr. at 422.  However, in his December 28, 2010 letter to Dr. Hasan, Dr. Clark indicated that he advised

Plaintiff that his clinical findings did not detect a significant focus of nerve root or spinal compression in the lumbar region. Tr. at 27, citing Tr. at 428. A lumbar spine MRI dated April 5, 2011 showed no nerve or cord compression or evidence of stenosis. *Id*. at 433. A September 19, 2011 MRI of the lumbar spine showed L2-L3 disc dessication with very minimal reduction in disc height and extremely mild disc bulging without evidence of canal or foraminal stenosis with fluid in the apophyseal joints at L2-L3 and no evidence of significant disc bulging or canal or foraminal stenosis. Id. at 474-475. No finding was made of nerve compression.

Similar to the cervical spine findings, however, the ALJ did not determine this conflict or make a finding that Plaintiff had or did not have nerve root compression in her lumbar spine. Tr. at 14. However, the Court finds that the same Step Four findings by the ALJ used for Plaintiff's cervical impairment in not meeting the requirements of Listing 1.04(A) also provide sufficient evidence in which to find that her lumbar impairments do not demonstrate the sensory or reflex loss component to motor loss required by Listing 1.04(A). Again, in assessing Plaintiff's credibility, the ALJ found that the record failed to clearly demonstrate that Plaintiff had "a significantly limited range of motion...muscle atrophy, motor weakness, sensation, loss or reflex abnormalities" that confirmed intense and disabling pain. Tr. at 18. Dr. Hasan's treatment notes consistently indicate that upon physical examination, Plaintiff had normal motor strength, no joint swelling or instability, and normal sensory examinations with no motor deficits in her upper and lower extremities. *See id.* at 383-390, 428-432. Dr. Hasan's medical source statements also indicated that no physical findings could be identified for the support of his very restrictive limitations for Plaintiff's physical work-related abilities as his limitations were based upon her subjective symptoms of weakness and pain. *Id.* at 450, 452. In addition, as to both Plaintiff's cervical and lumbar impairments, the ALJ relied upon the opinions of the state agency reviewing physicians who reviewed the medical evidence in Plaintiff's file under Listing 1.04 and determined that Plaintiff's impairments did not meet Listing 1.04. Tr. at

17, citing Tr. at 72-84.

For these reasons, the Court finds that substantial evidence supports the ALJ's decision finding that Plaintiff's cervical and lumbar impairments did not meet Listing 1.04(A).  The ALJ's decision as a whole sufficiently discussed the criteria of Listing 1.04(A) and cited to sufficient evidence in the record to allow this Court to find substantial evidence for the ALJ's Step Three finding.

**B**.    **RFC**

Plaintiff also challenges the ALJ's physical RFC finding, asserting that substantial evidence does not support his modified light work determination.  ECF Dkt. #11 at 19-22.  For the following reasons, the Court finds that substantial evidence supports the ALJ's RFC determination .

It is the ALJ who is responsible for determining a claimant's RFC.  20 C.F.R. § 404.1546(c); *Fleisher v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011).  The RFC is the most that a claimant can still do despite her restrictions.  SSR 96-8p.  It is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id*.  It is a claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." *Id*.  The Ruling defines a "regular and continuing basis" as 8 hours per day, five days per week, or the equivalent thereof. *Id.*

In determining a claimant's RFC, SSR 96-8p instructs that the ALJ must consider all of the following:  (1) medical history; (2) medical signs and lab findings; (3) the effects of treatment, such as side effects of medication, frequency of treatment and disruption to a routine; (4) daily activity reports; (5) lay evidence; (6) recorded observations; (7) statements from medical sources; (8) effects caused by symptoms, such as pain, from a medically determinable impairment; (9) prior attempts at

work; (10) the need for a structured living environment; and (11) work evaluations. SSR 96-8p. The ALJ must provide "a narrative discussion "describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." *Id.* The ALJ must also thoroughly discuss objective medical and other evidence of symptoms such as pain and set forth a "logical explanation" of the effects of the symptoms on the claimant's ability to work. *Id.*

In the instant case, the Court finds that substantial evidence supports the ALJ's physical RFC and he adequately fulfilled the requirements of SSR 96-8p. The ALJ reviewed Plaintiff's medical history, citing her fall at work and x-rays taken thereafter which showed only degenerative changes and a possible nerve root impingement at C6-C7 on the left. Tr. at 16. The ALJ noted that despite this fall and possible nerve root impingement, Plaintiff continued to work full-time and did not miss any time from work. *Id.* The ALJ also cited the conflict in the medical evidence regarding her cervical spine MRI which her treating neurosurgeon interpreted as showing a rupture disc at C6-C7 with an extruded free fragment and cord compression, while another doctor stated that no ruptured disc was shown but rather evidence of degenerative joint and disc disease secondary to the natural and normal aging process. *Id.* at 17. The ALJ noted that despite the conflicting medical reports, Plaintiff nevertheless underwent cervical spinal fusion surgery in October 2010 with an additional imaging study during that time which showed a herniated disc in her cervical spine. *Id.*

The ALJ reviewed the evidence following the cervical surgery which showed no evidence of instability at the surgical site in December 2010 and no complaints by Plaintiff as to her neck except dysesthesias which was normal in December of 2010 and no complaints at all about her neck in March of 2011. Tr. at 17, citing 417, 425, 428. The ALJ noted that following her neck surgery, Plaintiff's complaints shifted to her lower back, of which her treating neurosurgeon presented differing medical opinions as to whether there was any type of spinal cord compression. Tr. at 17, citing Tr. at 422, 428.

-25-

In addition to the medical history, the ALJ also discussed the opinions of Dr. Hasan as to Plaintiff's limitations. Tr. at 17. The ALJ noted Dr. Hasan's strict restrictions for Plaintiff's abilities, but highlighted Dr. Hasan's opinions that the limitations had not lasted more than one year and were not expected to last for more than one year. Tr. at 17, citing Tr. at 453. The ALJ also discussed Plaintiff's credibility as to the intensity and limiting effects of her impairments and pain, noting that Plaintiff continued to work full-time after she fell at work and objective medical evidence by Dr. Hasan showed no significant range of motion loss, muscle spasm, muscle atrophy, motor weakness of loss, or reflex abnormalities which are usually associated with intense and disabling pain. Tr. at 18. Dr. Hasan's treatment notes support the ALJ's finding. He noted on April 14, 2010, November 9, 2010, December 7, 2010, and January 31, 2011 that upon physical examination, Plaintiff presented with a normal gait, normal extremity movements, no joint instability and normal muscle strength and tone. Tr. at 384, 386, 388, 431. Further, on the same medical source statement in which Dr. Hasan severely restricted Plaintiff's abilities and opined that Plaintiff's impairments would not last or be expected to last for twelve months or more, he further stated that his restrictions were based upon Plaintiff's subjective symptoms and no physical findings. *Id*. at 450, 451, 452. Finally, the ALJ also relied upon the state agency physicians' opinions, who indicated that Plaintiff's impairments limited her to light work, with the restrictions that he used in his RFC. *Id*. at 17.

Keeping in mind the standard of review which is whether substantial evidence supports the ALJ's determination, even if substantial evidence may support the opposite conclusion, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff could perform a modified range of light work.

### C.     NEW EVIDENCE

Plaintiff also requests that the Court remand her case based upon additional evidence that she has submitted to this Court with her merits brief. ECF Dkt. #11 at 20; #11-1. She asserts that this

evidence of 179 pages of medical records is new and material and good cause existed for not submitting said evidence to the ALJ. *Id.* She contends that the evidence is new because it was not before the ALJ, it is material because it shows the continuation and worsening of her symptoms, and she asserts that good cause existed for not submitting it to the ALJ because it was not available until after the hearing. *Id.*

Sentence six of § 405(g) addresses situations where a claimant submits new evidence that was not presented to the ALJ but that could alter the ALJ's ultimate decision. Sentence six of § 405(g) provides, in relevant part:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both....

4 42 U.S.C. § 405(g).

A "sentence six" remand is appropriate "only if the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir.2010). Evidence is "new" if it did not exist at the time of the administrative proceeding and "material" if there is a reasonable probability that a different result would have been reached if introduced during the original proceeding. *Id.* "Good cause" is demonstrated by "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir.2001). "The party seeking a remand bears the burden of showing that these [ ] requirements are met." *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir.2006). Courts "are not free to dispense with these statutory requirements." *Id.* at 486.

In order to show good cause, a claimant is required to detail the obstacles that prevented her from entering the evidence in a timely manner. *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 Fed. Appx. 713, 725 (6th Cir.2012). The Sixth Circuit "takes a harder line on the good cause test' with respect to timing and thus requires that the claimant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.*, quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986).

In a sentence-six remand, the court does not rule in any way on the correctness of the administrative decision, neither affirming, modifying, nor reversing the Commissioner's decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.*

"'Good cause' is shown for a sentence-six remand only 'if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability.'" *Payne v. Comm'r of Soc. Sec.*, No. 1:09–cv–1159, 2011 WL 811422, at * 12 (W.D.Mich. Feb.11, 2010), unpublished (finding that evidence generated after the hearing and submitted to the Appeals Council for the purpose of attempting to prove disability was not "new").

Plaintiff does not discuss the additional medical evidence that she has submitted in any detail. She merely submits the medical records and concludes that all 179 pages are new and material because they were not submitted to the ALJ and good cause exists for not submitting them to the ALJ . ECF Dkt. #11 at 20. However, some of these records are not "new" in that they are already contained in her record before the ALJ. Compare, for example, ECF Dkt. #11-1 at 9 with Tr. at 480; ECF Dkt.

-28-

#11-1 at 12-13 with Tr. at 478-479; ECF Dkt. #11-1 at 14-15. Moreover, other of the records are not material in that they have nothing to do with the impairments for which Plaintiff sought social security benefits. *See* ECF Dkt. #11-1 at 16-17, 29-31 (records showing imaging and procedure for vaginal bleeding and imaging of sinuses).

Further, to the extent that Plaintiff argues that the records that are actually new are material because they show the deterioration of her conditions or symptoms, this argument fails. Evidence of a deterioration of a condition is not relevant since it "does not demonstrate the point in time that the disability itself began." *Sizemore v. Sec'y of Health and Human. Servs.*, 865 F.2d 709, 712 (6th Cir. 1988). Here, while the after-acquired evidence shows that Plaintiff's back condition deteriorated and she underwent back surgery in August of 2013, the evidence fails to show and Plaintiff fails to otherwise argue that the date upon which her back impairment actually became disabling had occurred during the relevant time period at issue in this case. Tr. at 159-161. The same can be said of Plaintiff's mental conditions. Further, even some of the "new" records that Plaintiff submitted show normal physical examinations and an October 23, 2012 letter from Dr. Clark to Dr. Hasan indicates that Plaintiff reported that her neck pain was greatly improved from surgery and his physical examination and her reported pain pattern did not fit the clinical picture that he expected from a lumbar region problem and surgery would not help with her problem. ECF Dkt. #11-1 at 20. Further, a March 20, 2013 MRI of Plaintiff's lumbar spine showed no nerve root compression. *Id*. at 114. In addition, Plaintiff has failed to argue and the remaining records fail to show that the Commissioner would have reached a different decision if presented with this additional evidence. *See Foster v. Halter*, 279 F.3d 348, 358 (6th Cir. 2001).

**VII**.    **CONCLUSION**

For the above reasons, the Court AFFIRMS the  decision of the Commissioner and DISMISSES Plaintiff's complaint in its entirety WITH PREJUDICE.

Dated: September 30, 2014                              */s/ George J. Limbert*
                                                                  GEORGE J. LIMBERT
                                                                  UNITED STATES MAGISTRATE JUDGE